IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| JOSE YUGAR-CRUZ,<br><br>    Petitioner,<br><br>  vs.<br><br>MATT MCCLEARY, Jail Administrator, Muscatine County Jail; DAVID EASTERWOOD, Field Office Director of Enforcement and Removal Operations, St. Paul Field Office, U.S. Immigration and Customs Enforcement; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, Secretary of Homeland Security, and PAMELA BONDI, United States Attorney General,<br><br>    Respondents.[1] | **3:25-cv-00136-SHL-HCA**<br><br><br><br>**ORDER DENYING PETITIONER'S MOTION TO ENFORCE** |

On December 23, 2025, the Court granted Petitioner Jose Yugar-Cruz's petition for writ of habeas corpus and ordered him to be released from custody until and unless the Government could show a significant likelihood of removal in the reasonably foreseeable future. (ECF 13.) On April 8, 2026, officials with U.S. Immigration and Customs Enforcement ("ICE") re-detained Yugar-Cruz at a check-in appointment, ostensibly because the Government has arranged for his removal to the Democratic Republic of Congo ("the Congo"). Yugar-Cruz seeks immediate release and an order requiring Federal Respondents to honor his statutory and due process rights. For the reasons that follow, the Court DENIES Yugar-Cruz's Motion to Enforce (ECF 17).

## I.    BACKGROUND.

Yugar-Cruz entered the United States on or about July 8, 2024, and immediately surrendered himself to law enforcement and was taken into ICE custody. (ECF 1, ¶¶ 24–25.) In September 2024, Yugar-Cruz was brought before an Immigration Judge for a bond hearing. (Id., ¶ 27.) Although Yugar-Cruz was not granted bond due to his recent entry to the United States, the Immigration Judge expressed no concerns regarding danger to the community. (Id.) Yugar-Cruz

---

[1] Markwayne Mullin and Todd Blanche are automatically substituted in as the Secretary of Homeland Security and Acting Attorney General, respectively. The Clerk of Court is directed to replace Kristi Noem and Pamela Bondi, respectively, on the docket.

applied for asylum in October 2024, and a hearing on his application occurred in December 2024. (Id., ¶¶ 28–29.)

In January 2025, an Immigration Judge issued a ruling finding Yugar-Cruz credible but denying asylum based on the absence of a nexus between the risk of torture that Yugar-Cruz would face in Bolivia and his political opinions. (Id., ¶ 30.) Yugar-Cruz was ordered removed to Bolivia. The Immigration Judge also, however, granted withholding of removal under the Convention Against Torture ("CAT") based on the torture Yugar-Cruz faced in the past in Bolivia and likely would face again in the future if returned to that country. (Id., ¶¶ 30–31.) As a result, Yugar-Cruz cannot be returned to Bolivia. The government did not appeal the Immigration Judge's ruling. (Id., ¶ 33.) Nonetheless, Yugar-Cruz was not released from custody, with ICE officers instead telling him that they were searching for a different country to send him. (Id., ¶¶ 33–35.) ICE tried without success to remove Yugar-Cruz to Argentina, Chile, Paraguay, Mexico, and Canada. (Id., ¶¶ 38–43.) He remained in ICE custody for more than seventeen months despite having no criminal history. (Id., ¶ 49.)

In December 2025, Yugar-Cruz filed a petition for writ of habeas corpus. (ECF 1.) Federal Respondents conceded that Yugar-Cruz has exhausted all third-country removal options without success and that there was no significant likelihood of Yugar-Cruz being removed to his home country or a third country in the reasonably foreseeable future. (ECF 12, pp. 1–2.) Federal Respondents therefore agreed that Yugar-Cruz should be ordered released on conditions of supervision. (Id.) The Court ordered Respondents to release Yugar-Cruz from custody without delay under reasonable conditions of supervision. (ECF 13.) The Order further specified: "Absent a violation of the conditions of supervision, Federal Respondents may not revoke Yugar-Cruz's supervision and detain him without demonstrating that changed circumstances create a significant likelihood of removal in the reasonably foreseeable future. 8 C.F.R. § 241.13(i)(2)." (Id.) Federal Respondents subsequently confirmed that Yugar-Cruz was released from custody. (ECF 15.) Yugar-Cruz's asylum case was transferred to Washington, D.C. based on his representation that he intended to reside in Alexandria, Virginia. (ECF 15-1; ECF 21-1, ¶ 14.)

According to Federal Respondents, the U.S. Department of State finalized a Third County Removal Agreement with the government of the Democratic Republic of the Congo in December 2025. (ECF 21-2, ¶ 4.) "The Democratic Republic of the Congo provided diplomatic assurances that aliens removed from the United States pursuant to the Third Country Removal agreement

would not be subjected to persecution or torture as part of this agreement." (Id., ¶ 5.) The Department of State determined that these diplomatic assurances were credible. (Id.)

On March 9, 2026, an ICE official was notified that Yugar-Cruz was accepted by the government of the Congo for third-country removal. (Id., ¶ 4.) ICE determined that it would follow the March 30, 2025, memorandum *Guidance Regarding Third County Removals* (hereinafter, the "March 30 Guidance") to effectuate Yugar-Cruz's removal. (Id., ¶ 7.) His name was placed on the manifest for the charter to the Congo on April 15, 2026. (Id., ¶ 6.) On April 1, 2026, an ICE Field Office Director revoked Yugar-Cruz's order of supervision pursuant to 8 C.F.R. 241.4(l) based on the imminent removal of Yugar-Cruz to the Congo. (ECF 21-1, ¶ 16.)

On April 8, 2026, Yugar-Cruz was taken into custody at an ICE check-in in Cedar Rapids, Iowa. (ECF 17-1, p. 1.) He asserts that he did not receive prior notice of his re-detention. (Id.) Following his re-detention, Federal Respondents communicated their intent to remove Yugar-Cruz to the Congo. (*See* ECF 17-5, p. 2.) ICE officials conducted an initial informal interview, where Yugar-Cruz indicated that he was afraid of being removed to the Congo and requested a credible-fear interview. (*See* ECF 17-4, ¶ 3; ECF 17-5, p. 7.)

Documents provided to counsel for Yugar-Cruz include an ICE Form 71-091, Notice of Revocation of Release, indicating that Yugar-Cruz's "release has been revoked pursuant to 8 C.F.R. § 241.4(l)." (ECF 17-5, p. 5.) The Notice further states that "[i]t is appropriate to enforce the removal order entered against you as ICE has the ability and mean to effectuate your removal," and "ICE is seeking a travel document to effect your expeditious removal to Dem. Republic of Congo." (Id.) Although ICE officials did not check the box on this form indicating that it had obtained a travel document and scheduled removal, a separate document entitled "Notice of Imminent Removal Pursuant to 8 C.F.R. § 241.4(g)(4)" states "ICE is in possession of a travel document to affect your removal and expects this to occur in **(April 2026)**." (Id., p. 8.) The document further explains that Yugar-Cruz will remain in custody pending his removal. (Id.) Federal Respondents also provided a Form I-200, Warrant for Arrest of Alien dated April 7, 2026, that was served on Yugar-Cruz on April 8, 2026. (Id., p. 10.) It states that there is probable cause to believe that Yugar-Cruz is removable from the United States based on "statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law." (Id., p. 10.)

Yugar-Cruz challenges the Federal Respondents' actions through his Motion to Enforce Court's December 23, 2025 Order. (ECF 17.) It seeks immediate release "in light of Respondents' apparent violation of the Court's December 23, 2025 order" and "[b]ecause Respondents cannot validly remove Petitioner to the Congo." (ECF 17-1, pp. 2–3.) In the alternative, Yugar-Cruz requests an Order "requiring Respondents to provide Petitioner with his statutory rights to protection and due process of law prior to effectuating any third-county removal." (Id., p. 3.) Federal Respondents filed a response explaining why they believe Yugar-Cruz's detention and third-county removal are proper. (ECF 21.) Yugar-Cruz then filed a Reply. (ECF 24.)

## II.    LEGAL ANALYSIS.

Yugar-Cruz argues, first, that the Federal Respondents have not established "changed circumstances" or a "significant likelihood of removal in the reasonably foreseeable future" and thus violated the Court's Order by taking him into custody. He places particular emphasis on a statement in the Notice of Revocation of Release that ICE is "seeking a travel document," as opposed to the box stating that "ICE has obtained a travel document," as well as other discrepancies in the documents relied upon by the Federal Respondents. (ECF 17-1, p. 6.) This argument is not enough to entitle Yugar-Cruz to relief because the Federal Respondents have established that ICE has a travel document to effectuate his removal. (ECF 17-5, p. 8.) This satisfies the Court's requirement that there be "changed circumstances" and a "significant likelihood of removal in the reasonably foreseeable future." (ECF 13, pp. 1–2.)

Yugar-Cruz next argues that Federal Respondents have not shown that third-country removal to the Congo is proper. (ECF 17-1, p. 7.) He states that Federal Respondents must give him an opportunity to develop his credible-fear claim about being sent to the Congo. (Id.) He also asserts that he is a member of the certified class in *D.V.D. v. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 378 (D. Mass. 2025), although he backs away from this position somewhat in his Reply Brief. In any event, Yugar-Cruz argues that "[t]o properly remove him [to the Congo] would require the government to reopen Petitioner's removal proceedings, designate the Congo, and allow him to develop his fear-based claim as to the Congo." (Id., p. 9.)

*D.V.D.* does more harm than good for Yugar-Cruz's position. There, the District of Massachusetts certified a class and entered a preliminary injunction enjoining the Government from removing noncitizens to third countries pursuant to the March 30 Guidance without first providing the noncitizens with notice and an opportunity to be heard. *See D.V.D.*, 778 F. Supp. 3d

at 392–93. The District of Massachusetts's analysis is unquestionably favorable to Yugar-Cruz's position. *See id.* The problem for him, however, is that shortly thereafter the United States Supreme Court took the unusual step of granting a stay of the injunction, *see Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025), then reiterated in a subsequent ruling that the earlier stay "stayed the April 18 preliminary injunction in full" and that the District of Massachusetts could not thereafter use alternative means "to enforce an injunction that our stay rendered unenforceable," *see Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2627, 2629 (2025).

The District of Massachusetts later entered final judgment and awarded relief that largely, but not entirely, tracked the preliminary injunction it ordered previously. *See D.V.D. v. Dep't of Homeland Sec.*, --- F. Supp. 3d ----, 2026 WL 521557, at *44 (D. Mass. Feb. 25, 2026). But it also temporarily stayed the judgment, with the First Circuit later extending the stay pending appeal. *See* Order at 1, *D.V.D. v. Dep't of Homeland Security*, Case No. 26-1212 (1st Cir. Mar. 16, 2026). Thus, as Respondents correctly state, "as the *D.V.D.* litigation currently stands, the March 30 guidance remains valid." (ECF 21, p. 9.)

This is all but fatal to Yugar-Cruz's claim. He is a member of a class of people for whom the Supreme Court has twice issued orders lifting injunctions that prohibited third country removals like the one Federal Respondents are attempting to carry out here. In other words, when a different district court tried to do what Yugar-Cruz is asking this Court to do, the Supreme Court intervened twice to stop it. Accordingly, the Court could not grant Yugar-Cruz the relief he seeks without ignoring (a) the fact that he is part of the class in *D.V.D.* and (b) the Supreme Court's (and, now, First Circuit's) decision to stay injunctive relief for that class. In these circumstances, the Court has little choice but to deny the Motion to Enforce insofar as it relies on arguments like those raised in the District of Massachusetts. *See Ghamelian v. Baker*, No. 25-cv-02106, 2025 WL 2049981, at *3 (D. Md. July 22, 2025) (concluding that "claims relating to [petitioner's] potential third country removal are more appropriately resolved in the *D.V.D.* case and will not be addressed in this Court"); *Sanchez v. Bondi*, No. 1:25-cv-02287, 2025 WL 2550646, at *3 (D. Colo. Aug. 20, 2025) (recognizing that principles of comity and judicial economy prevent the court from asserting jurisdiction over "virtually identical claims between essentially the same parties" (quoting *I.V.I. v. Baker*, No. 25-cv-1572, 2025 WL 1519449, at *2 (D. Md. May 27, 2025))).

Granted, Yugar-Cruz raises arguments that were not specifically addressed in *D.V.D.*, such as arguments focusing on the procedural requirements of 8 C.F.R. § 241.13. But even if the

Court could entertain these arguments without running afoul of the fact that Yugar-Cruz is a member of the certified class in *D.V.D.*, the arguments would not entitle him to relief. For example, the record shows that Respondents explained to Yugar-Cruz why he was being re-detained (ECF 17-5, p. 5) and that Yugar-Cruz had the opportunity to express concerns about being deported to the Congo (id., p. 7). When the District of Massachusetts entered an injunction giving non-citizens like Yugar-Cruz stronger due process protections than these, the Supreme Court vacated it. The Court cannot award relief on a one-off basis that the Supreme Court would not allow to be awarded en masse.

**III.    CONCLUSION.**

The Motion to Enforce is DENIED. (ECF 17.)


**IT IS SO ORDERED.**


Dated this 27th day of April, 2026.

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE